[No. B176151. Second Dist., Div. One. June 14, 2005.]

L.B. RESEARCH AND EDUCATION FOUNDATION, Plaintiff and
Appellant, v.
THE UCLA FOUNDATION et al., Defendants and Respondents.

**COUNSEL**

Greenwald, Hoffman, Meyer & Montes, Raul M. Montes; Law Offices of David C. Hinshaw, David C. Hinshaw; Horvitz & Levy, David M. Axelrad and John A. Taylor, Jr., for Plaintiff and Appellant.

James E. Holst, Eric K. Behrens; Greines, Martin, Stein & Richland and Marc J. Poster for Defendants and Respondents.

## OPINION

**VOGEL, J.**—A donor contributed $1 million to establish an endowed chair at the UCLA School of Medicine, which UCLA accepted along with the conditions imposed by the donor. The primary question on this appeal is whether the agreement created (1) a contract subject to a condition subsequent or (2) a charitable trust, the answer to which supposedly determines whether the donor has standing to sue UCLA and the Regents of the University of California to enforce the terms of the gift. We find there is a contract subject to a condition subsequent, not a charitable trust, and also find that, in either event, the donor has standing to pursue this action. Because the trial court reached a contrary result, we reverse.

### FACTS

### A.

In July 2000, the L.B. Research and Education Foundation (a nonprofit public benefit corporation) gave the UCLA Foundation (a fully qualified public charity) a contribution of $1 million to establish an endowed chair, the Julien I. E. Hoffman, M.D., Chair in Cardiothoracic Surgery. By the terms of the parties' agreement (which was signed by both L.B. Research and the UCLA Foundation), the fund thereby created must be used by Chair holders who meet specified criteria to "support basic science research activities that may have the potential for clinical applications."[1] Annual financial accounts must be provided to L.B. Research, along with a brief report of the work accomplished, both "in perpetuity." In this regard, the writing provides:

"It is [L.B. Research's] wish that the Hoffman Chair exist in perpetuity. [L.B. Research] understands, however, that unforeseen circumstances may alter the academic plan of the University or remove the subject area from the campus academic plan. In such circumstances, *if the Cardiothoracic Surgery program shall cease to exist at UCLA, or in the event that UCLA does not meet the terms and conditions of this agreement,* any and all funds shall be

---

[1] The Chair holder (referred to in the writing as the "incumbent") must "be a full and tenured professor with an established research interest. In addition, he or she will be a trained cardiac surgeon; will have received basic research training; will be actively involved in cardiovascular research; will have established a proven record of high-quality research as demonstrated by publication in peer-reviewed journals and funding awarded from outside sources; should be eligible for membership in the Cardiovascular Research Institute or Center or an organization of similar distinction. [¶] The incumbent may have clinical responsibilities but is dedicated to research aspects. [¶] The incumbent will have an established track record of mentoring cardiac surgeons to conduct basic research. [¶] The incumbent shall not hold an administrative position in the Department of Surgery or its Divisions—for example, Chair, Vice-Chair, Division Chief, Section Chief, and so on."

transferred to support an endowed chair in Cardiothoracic Surgery, on the same terms and conditions as herein set forth, in the Division of Cardiothoracic Surgery in the Department of Surgery at the University of California, San Francisco, School of Medicine. In the event that the Cardiothoracic Surgery program shall cease to exist in the Department of Surgery at the University of California, San Francisco, School of Medicine, any and all funds shall be transferred by the President of the University of California to another University within the University of California system to support an endowed chair in Cardiothoracic Surgery on the same terms and conditions as herein set forth. In the event that the Cardiothoracic surgery program shall cease to exist within the University of California system, the President of the University of California is authorized to redesignate the purpose of the Chair Fund, taking into consideration [L.B. Research's] expressed wishes regarding the designated purpose described in this document." (Italics added.)

The Chair was funded as promised.

## B.

In October 2003, L.B. Research sued the UCLA Foundation and the Regents of the University of California for specific performance of the agreement, declaratory relief, and breach of contract, alleging that the UCLA Foundation and the Regents had failed to employ personnel meeting the criteria of the Chair; failed to account to L.B. Research; offered the Chair to nonqualified individuals and, over the objection of L.B. Research and the Attorney General of the State of California, elected an unqualified person to the Chair; withdrew unearned fees from the Chair's fund; and refused to deliver the Chair's fund to the Department of Surgery at the University of California, San Francisco, School of Medicine.

In its first amended complaint, L.B. Research alleges that it (through its own personnel and through the Attorney General's office) brought these alleged violations to the attention of the appropriate people at UCLA and demanded performance in accordance with the terms of the gift, but that no response was forthcoming. The parties' agreement is an exhibit to the complaint.

The UCLA Foundation and the Regents answered, alleging among other things that L.B. Research had created a charitable trust which only the Attorney General had standing to enforce, then moved for judgment on the pleadings on the ground that L.B. Research lacked standing to prosecute this action. Over L.B. Research's opposition, the motion was granted, and this appeal is from the judgment thereafter entered.

## DISCUSSION

L.B. Research contends it has standing to bring this action, and that the motion for judgment on the pleadings should have been denied. We agree.

### A.

■ "A charitable trust is defined as: '. . . a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose.' (Rest.2d Trusts, § 348, p. 210.)" (*Hardman v. Feinstein* (1987) 195 Cal.App.3d 157, 161 [240 Cal.Rptr. 483]; see also Gov. Code, § 12581.) To create a charitable trust, there must be a proper manifestation by the settlor of an intention to create a trust, a trust res, and a charitable purpose. (*City of Palm Springs v. Living Desert Reserve* (1999) 70 Cal.App.4th 613, 620 [82 Cal.Rptr.2d 859].)

But a gift may have a charitable purpose and yet not constitute a charitable trust. Thus, the owner of property may, rather than create a trust, "transfer it to another on the condition that if the latter should fail to perform a specified act[,] the transferee's interest shall be forfeited either to the transferor or to a designated third party. [Citation.] 'In such a case the interest of the transferee is subject to a condition subsequent and is not held in trust.' (Rest.2d Trusts, *supra*, § 11, com. a, p. 32)." (*City of Palm Springs v. Living Desert Reserve, supra*, 70 Cal.App.4th at p. 621, fn. omitted; see *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 125 [3 Cal.Rptr.2d 275].)

■ The gifts at issue in the *Red Bluff* and *Palm Springs* cases (a public library and a desert wildlife preserve) were of land, not money, but were (as here) for charitable purposes and are otherwise indistinguishable from our case. As the court explained in *City of Palm Springs v. Living Desert Reserve, supra*, 70 Cal.App.4th at pages 621–622, a "gift of property in fee subject to a condition subsequent differs from a gift of that same property in trust in at least two ways. First, the transferee of a conditional gift receives both legal and equitable title to the property. Unless and until the transferee breaches the conditions imposed by the transferor, he or she is in the same position as an owner in fee simple absolute. [Citation.] Second, the transferee has no enforceable duties. The breach of condition may result in the termination of the transferee's interest, but it does not subject the transferee to actions for damages or to enforce the condition. [Citation.]

■ " 'Whether a trust or a condition is created depends upon the manifested intention of the transferor; the mere fact that the word "condition" is used does not necessarily indicate that a condition and not a trust is intended.'

[Citation.] Trusts can be created by words of condition. [Citation.] Property given 'upon condition' that it be applied to certain charitable purposes is especially likely to be construed as having been given in a charitable trust. [Citation.] The question in each case is whether (1) the donor intended to provide that if the property were not used for the designated charitable purposes it should revert either to the donor's estate or to a contingent donee, or (2) the donor intended to impose an enforceable obligation on the donees to devote it to those purposes. [Citation.]

■ "Courts favor the construction of a gift as a trust over a conditional gift for several reasons. Because forfeiture is a harsh remedy [citation], any ambiguity is resolved against it [citation]. Moreover, the transferor's objective is to use the transferee to confer a benefit upon the public. To ensure that the benefit is conferred as intended, the transferor ordinarily wants the intended beneficiary to be able to enforce that intent. Because the only remedy for the breach of a condition is a forfeiture, a condition is not a very effective method of accomplishing those goals. For both of those reasons, courts will generally construe a conveyance as one upon trust rather than upon condition. [Citation.]

"However, if the donor clearly manifests an intention to make a conditional gift, that intention will be honored. [Citation.] The gift will be construed as one of a fee simple subject to a condition subsequent if '. . . it is expressly provided in the instrument that the transferee shall forfeit it or that the transferer or his heir or a third person may enter for breach of the condition.' [Citations.]" (*City of Palm Springs v. Living Desert Reserve, supra*, 70 Cal.App.4th at pp. 621–622.)

## B.

■ Accordingly, the first question before us is whether L.B. Research made a gift of $1 million subject to conditions subsequent, or whether instead it created a charitable trust. If it was a conditional gift, L.B. Research has standing to pursue this action. (*City of Palm Springs v. Living Desert Reserve, supra*, 70 Cal.App.4th at p. 623 [when the agreement is a contract subject to a condition subsequent and does not create a charitable trust, the Attorney General is not a necessary party to the action].) If a charitable trust was created, the question about standing must be separately considered. (See part C., *post.*)

## 1.

■ Because the threshold issue turns on our interpretation of an allegedly ambiguous contract, L.B. Research was entitled to allege its own construction of the agreement (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991)

231 Cal.App.3d 232, 239 [282 Cal.Rptr. 233]), and those allegations, unless contradicted by the actual writing attached to the complaint (which they are not), are deemed true for purposes of UCLA's motion for judgment on the pleadings (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516 [101 Cal.Rptr.2d 470, 12 P.3d 720]; *Martinez v. Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 400 [113 Cal.Rptr. 585, 521 P.2d 841]; *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 128 [226 Cal.Rptr. 32]).

We emphasize that our decision about whether this contract is in fact ambiguous might, given an appeal at a different stage in this case, be enhanced by the consideration of extrinsic evidence (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641]), which might in the end bring us to a different conclusion about whether a charitable trust was created. As it is, UCLA and the Regents are bound by the rules governing our review of the motion they made, and the ambiguities must be construed in favor of L.B. Research, not in favor of the interpretation urged by UCLA and the Regents.

### 2.

L.B. Research alleges that the instrument is a contract and that it is ambiguous—because it "gives" a contribution of $1 million to UCLA (which arguably sounds like an outright gift) but also includes language of the sort used to create a condition subsequent ("if" the money is not used as directed, the fund is to be transferred to another institution), and obligates UCLA to account and report annually to L.B. Research (which supports an inference that a failure to comply with the conditions would result in a forfeiture). The essential terms of the agreement are spelled out in the writing, which is dated and signed by both L.B. Research and the UCLA Foundation. The writing, as construed by L.B. Research, thus shows an intent "to provide that if the [fund] were not used for the designated . . . purposes it should revert . . . to . . . a contingent donee, [and that L.B. Research] intended to impose an enforceable obligation on [the UCLA Foundation] to devote [the fund] to [the stated] purposes [on the stated conditions]." (*City of Palm Springs v. Living Desert Reserve, supra,* 70 Cal.App.4th at p. 622.)

To avoid this result, UCLA and the Regents contend that, because the agreement does not have an absolute forfeiture provision, it must be construed to create a charitable trust. We disagree. Although it is true that UCLA's failure to abide by the conditions imposed by the agreement would not accomplish a forfeiture vis-à-vis the entire University of California system, it would nonetheless be a forfeiture for the medical school at UCLA,

which was plainly viewed by L.B. Research as a specific donee.[2] (Prob. Code, § 15201 [a trust is created only if the settlor properly manifests an intention to create a trust]; *Estate of Ralston* (1934) 1 Cal.2d 724, 726 [37 P.2d 76].) Because UCLA's loss will be UC San Francisco's gain, the nature of this forfeiture supports rather than defeats L.B. Research's position and does not require adoption of a view antagonistic to the donor's charitable intent.

■ We conclude, therefore, that the agreement is a conditional contract, and that L.B. Research has standing to pursue its claims against UCLA and the Regents. (*Rosecrans v. Pacific Elec. Ry. Co.* (1943) 21 Cal.2d 602, 606 [134 P.2d 245] [in order to ascertain the intent of the parties, the interpretation of a condition subsequent must be based on the writing as a whole].)

## C.

■ Had we concluded otherwise (and found within the constraints of this appeal from a judgment on the pleadings that L.B. Research's gift created a charitable trust), we would have reversed on the ground that the Attorney General's power to enforce charitable trusts does not in this type of case deprive the donor of standing to enforce the terms of the trust it created. (Gov. Code, §§ 12591, 12598; *Holt v. College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2d 750, 752–757 [40 Cal.Rptr. 244, 394 P.2d 932] [minority directors of charitable corporations have an interest in ensuring that contributions are used for the purpose they were received in trust, and thus have standing to sue the majority directors].)

■ As our Supreme Court observed in *Holt*, the "prevailing view of other jurisdictions is that the Attorney General does not have exclusive power to enforce a charitable trust and that a trustee or *other person having a sufficient special interest* may also bring an action for this purpose. This position is adopted by the American Law Institute (Rest.2d Trusts, § 391) and is supported by many legal scholars. [Citations.] [¶] In accord with the majority view, this court has stated that '. . . the only person who can object to the disposition of the trust property is one having some definite interest in the property—he must be a trustee, or a *cestui, or have some reversionary*

---

[2] On this point, both parties have submitted requests for judicial notice comprised of printouts from various Web sites maintained by UCLA and the University of California. However tantalizing this public information might be, it is plainly subject to interpretation and for that reason not subject to judicial notice or to our consideration in reviewing the trial court's order granting a motion for judgment on the pleadings. (Evid. Code, §§ 451, 452; *Comings v. State Bd. of Education* (1972) 23 Cal.App.3d 94, 102 [100 Cal.Rptr. 73] [improper to judicially notice fact subject to reasonable dispute]; cf. *McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 162 [86 Cal.Rptr.2d 645].)

*interest* in the trust property.' [Citations.]" (*Holt v. College of Osteopathic Physicians & Surgeons, supra,* 61 Cal.2d at p. 753, italics added, fn. omitted.)

The statutes giving the Attorney General the power to bring an action for the enforcement of a charitable trust "were enacted in recognition of the problem of providing adequate supervision and enforcement of charitable trusts. Beneficiaries of a charitable trust, unlike beneficiaries of a private trust, are ordinarily indefinite and therefore unable to enforce the trust in their own behalf. [Citations.] Since there is usually no one willing to assume the burdens of a legal action, or who could properly represent the interests of the trust or the public, the Attorney General has been empowered to oversee charities as the representative of the public, a practice having its origin in the early common law. [Citation.]

"In addition to the general public interest, however, there is the interest of donors who have directed that their contributions be used for certain charitable purposes. Although the public in general may benefit from any number of charitable purposes, charitable contributions must be used only for the purposes for which they were received in trust. [Citations.] Moreover, part of the problem of enforcement is to bring to light conduct detrimental to a charitable trust so that remedial action may be taken. The Attorney General may not be in a position to become aware of wrongful conduct or to be sufficiently familiar with the situation to appreciate its impact, and the various responsibilities of his office may also tend to make it burdensome for him to institute legal actions except in situations of serious public detriment. [Citations.] [¶] . . . [¶]

"Although the Attorney General has primary responsibility for the enforcement of charitable trusts, the need for adequate enforcement is not wholly fulfilled by the authority given him. The protection of charities from harassing litigation does not require that only the Attorney General be permitted to bring legal actions in their behalf. This consideration '. . . is quite inapplicable to enforcement by the fiduciaries who are both few in number and charged with the duty of managing the charity's affairs.' [Citation.] *There is no rule or policy against supplementing the Attorney General's power of enforcement by allowing other responsible individuals to sue in behalf of the charity.* The administration of charitable trusts stands only to benefit if in addition to the Attorney General other suitable means of enforcement are available." (*Holt v. College of Osteopathic Physicians & Surgeons, supra,* 61 Cal.2d at pp. 754–756, italics added, fns. omitted; and see *San Diego etc. Boy Scouts of America v. City of Escondido* (1971) 14 Cal.App.3d 189, 195 [92 Cal.Rptr. 186] ["But the right of the Attorney General to sue to enforce a charitable trust is not exclusive: other responsible individuals may be permitted to sue on behalf of the charity"].)

 Under either scenario—conditional contract or charitable trust—the motion for judgment on the pleadings should have been denied.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to vacate its order granting the motion for judgment on the pleadings, enter a new order denying the motion, and place the case back on track for trial. L.B. Research Foundation is entitled to its costs of appeal.

Spencer, P. J., and Rothschild, J., concurred.

A petition for a rehearing was denied July 12, 2005, and respondents' petition for review by the Supreme Court was denied August 31, 2005.