Edwin **HARDT** and Karl Hardt, Appellants,

v.

**VITAE FOUNDATION, INC., Respondent.**

**No. WD 70525.**

Missouri Court of Appeals, Western District.

Nov. 10, 2009.

Application for Transfer to Supreme Court Denied Dec. 22, 2009.

Application for Transfer Denied March 2, 2010.

James Bopp, Jr., and Clayton J. Callen, Terre Haute, IN, for Appellants.

Dale Doerhoff, Jefferson City, MO, Mike W. Bartolacci and Maria G. Zschoche, St. Louis, MO, for Respondent.

Before Division III: THOMAS H. NEWTON, Chief Judge, and MARK D. PFEIFFER and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

Edwin Hardt and Karl Hardt ("the Hardts") appeal from the circuit court's judgment dismissing for lack of standing their petition to enforce their charitable gift and the conditions thereon to the Vitae Foundation, Inc. ("Vitae"). We affirm.

## Factual and Procedural Background

Appellants Edwin Hardt and Karl Hardt are executors of the estate of Selma J. Hartke. Pursuant to Ms. Hartke's will, they were given discretion to distribute the remainder of her estate to charitable organizations of their choosing. The Hardts determined to use a large portion of the estate to support the pro-life cause. In January 2001, the Hardts requested a meeting with Vitae, a non-profit charitable corporation describing itself as an "advertising campaign for life ... [that] research[es], produce[s] and purchase[s] airtime in an effort to encourage a greater respect for human life, restore traditional values in our American culture, and reduce the number of abortions by using mass media education." The Hardts requested that Vitae submit a proposal for a possible grant.

In March 2001, the Hardts met with Sandra Faucher, Vitae's then-National Project Director, and Vitae's President Carl Landwehr. Vitae presented a grant proposal to the Hardts at that meeting, which focused on ten of the top twenty-five media markets in the United States. The proposal stated that Vitae planned to air media campaigns in all twenty-five media markets by 2003 but that Vitae lacked the funding to effectuate this goal in the ten markets contained in the proposal. Vitae stated that airing media campaigns in all of the top twenty-five markets was vitally important because television advertising was the most effective way of reaching women most vulnerable to abortions. The proposal set out a dollar figure for funds needed in each of the ten markets in order to fulfill Vitae's goals of airing media campaigns there. To illustrate why the Hardts' gift was needed, the proposal also contained a brief description of each market's importance, the type of broadcast to be used, the relative cost of broadcasting there, and the current status of local financial support.

Ms. Faucher suggested at the March 2001 meeting that any gift from the Hardts be used as a "matching gift," to be spent in equal proportions to funds raised by Vitae in each of the ten markets. By utilizing this 50/50 matching concept, the grant would entice other donations in the various markets to ensure a lasting donor base for future media campaigns.

On March 9, 2001, following the meeting and proposal, the Hardts granted to Vitae $4,242,000 ("2001 gift"), the total amount identified in the proposal as needed to air media campaigns to the ten specified markets. A letter of intent accompanied the grant to Vitae, which stated the grant was given:

> to permit the development of Florida, Oregon, Ohio, Maryland, Texas, Arizona, and Washington and Generation Y [1] in San Francisco and Los Angeles as set

1. A different type of media campaign aimed at reaching a younger generation of women.

forth in the proposal prepared for Ed Hardt dated March 2001. It is their understanding that the Foundation will use these funds as a challenge gift so that the funds will not be fully consumed in the initial media campaign but will be the basis for establishing an ongoing presence in these markets.

On March 12, 2001, receipt of the gift was acknowledged and the letter of intent was signed by Landwehr as "agree[ing] to the terms and conditions of the gift."

In November of 2002, the Hardts granted an additional $4,000,000 from the estate to Vitae ("2002 gift"). Of this gift, $3,000,000 was to be used as matching funds for media campaigns in markets of Vitae's choosing. The additional $1,000,000 was to be used by Vitae for the continued development of a website aimed at teens without mention of matching funds. This additional $1,000,000 is not at issue in this suit.

In August of 2003, Ms. Faucher contacted the Hardts' counsel and informed him that some portions of the Hardts' grant to Vitae were not being used in accordance with the conditions placed on the gifts but, instead, were being expended for administrative expenses, including the hiring of significant new staff members, and were being spent without the receipt of matching funds. She also told the Hardts' counsel that Vitae's promised expansion of media campaigns in new markets was not occurring.[2]

On September 8, 2003, the Hardts requested an accounting from Vitae with respect to both gifts. On September 26, 2003, Landwehr sent a letter to the Hardts indicating that subsequent to their gifts, Vitae had adopted a new development strategy. The Hardts later learned that

little money was being used for media campaigns at all.

On January 13, 2004, Landwehr sent a letter to the Hardts describing a "radically different" development strategy that he had implemented subsequent to the Hardts' gifts. The new strategy "scaled back" Vitae's plans to enter additional media markets and, instead, focused on building relationships with "high level influential leaders" in the various markets and building an "operational support team" to assist with new fundraising.

The Hardts claim that the last accounting provided to them by Vitae, dated June 30, 2005, evidences extensive misuse of the 2001 gift as:

(a) nearly half of the funds expended have been spent on administrative expenses, in fact, in multiple markets no media expenditures have been made whatsoever,

(b) the gift has been spent in the absence of the receipt of matching funds, and (c) funds have been spent in markets not part of the terms of the 2001 gift.

The Hardts also claim that they have not received sufficient information from Vitae to ascertain whether Vitae has fully complied with its restrictions in regard to the 2002 gift.

On August 6, 2008, the Hardts filed a petition in the Cole County Circuit Court seeking: (a) a detailed accounting of both the 2001 and 2002 gifts, (b) the restoration of any part of either gift spent in contravention of conditions placed on the gifts, (c) an injunction preventing any future expenditure of funds from either gift in any manner inconsistent with the applicable conditions, or (d) in the alternative, the transfer of the 2001 gift to another charitable organization of the Hardts' choosing.

---

2. By August of 2003, Ms. Faucher was no longer employed by Vitae.

On September 22, 2008, Vitae filed a motion to dismiss the Hardts' petition. The motion was heard by the trial court on November 25, 2008. On December 5, 2008, the trial court granted the motion to dismiss and held that the Hardts lacked standing to bring their claims.

## Standard of Review

■ When reviewing the trial court's granting of a motion to dismiss, "we engage in an essentially de novo review of an issue of law." *In re Swearingen,* 42 S.W.3d 741, 745 (Mo.App. W.D.2001) (internal quotation marks omitted). We assume all of the facts alleged in the plaintiffs' petition are true. *Id.* However, "it is not enough that the plaintiff alleges a cause of action existing in favor of someone; he must show that it exists in favor of himself, and that it accrued to him in the capacity in which he sues." *Voelker v. Saint Louis Mercantile Library Ass'n,* 359 S.W.2d 689, 693 (Mo.1962) (internal quotation marks omitted).

## Legal Analysis

At common law, only the Attorney General had standing to enforce the terms of a charitable gift. *Id.* at 695. This rule applied to gifts both to charitable trusts and charitable corporations and was made primarily to prevent potential beneficiaries without a "special interest" in the gift from "vex[ing]" public charities with "frequent suits, possibly based on an inadequate investigation." *Id.* Since the Attorney General represents the public at large, he can enforce the terms of the charitable donation on behalf of all of the beneficiaries, which for public charities means the general public.

Donors were also prevented from enforcing their gifts in court, because non-trustee donors retained no interest in the gift, "except the sentimental one that every person who contributed" to the charity would be presumed to have. *Id.* at 694.[3] Accordingly, the donor was left with no ability to make sure the charitable organization used the gift according to the gift's terms and conditions.

An exception to this rule existed, however, when the donor specifically made the charitable gift subject to a condition subsequent to the donation. In these cases, if the charitable trust or charitable corporation failed to perform the specified act, the gift would revert back to the donor or to a designated third party. *L.B. Research & Educ. Found. v. UCLA Found.,* 130 Cal. App.4th 171, 29 Cal.Rptr.3d 710, 713 (2005). The donor of such a gift had standing to enforce the conditions placed on the gift because it retained an interest in the property. *Id.* at 714. The parties agree that this exception does not apply in this case.

Recently, there has been a trend in the law to give donors more control over the enforcement of the terms of their charitable gifts. In 2005, Missouri adopted the Uniform Trust Code ("MUTC"). This law specifically granted settlors of *charitable trusts* the ability to "maintain a proceeding to enforce the trust." § 456.4–405.3 RSMo. The law was also made retroactive to apply to trusts created before its enactment. § 456.11–1106 RSMo. The law, on its face, clearly applies *only* to trusts.

■ The Hardts do not claim that their gift was made in trust, constructive or otherwise. They simply contend that the MUTC also applies to gifts made, absent a trust, to charitable corporations. To support this contention, they cite *Voelker,* a

---

**3.** Although the donors in this case were contributing members of the charitable corporation, the same analysis would apply to non-member donors to a charitable corporation.

case from 1962.[4] In *Voelker*, the court specifically held that only the Attorney General had standing to sue but did remark that "many of the principles applicable to charitable trusts are applicable to charitable corporations." 359 S.W.2d at 694 (internal quotation marks omitted).

The Hardts argue that because common law charitable trust principles have often applied to charitable corporations, newly enacted statutes addressing only charitable trusts must also apply to charitable corporations. The extension of common law charitable trust principles to gifts to charitable corporations is not enough to authorize this court's extension of the MUTC, a statutory provision that on its face applies only to charitable trusts, to gifts made outright to charitable corporations.

■ Where the language of a statute is clear and unambiguous, there is no room for construction. *In re Brams Trust # 2 v. Haydon*, 266 S.W.3d 307, 312 (Mo.App. W.D.2008). If a term is defined within a statute, a court must give effect to the legislature's definition. *Jones v. Dir. of Revenue*, 832 S.W.2d 516, 517 (Mo. banc 1992). Not only does the MUTC grant only the settlor of a charitable trust the right to maintain an action to enforce conditions of a trust, it also defines "charitable trust" and "settlor." A "charitable trust" is "a trust, or portion of a trust, created for a charitable purpose," and a "settlor" is "a person, including a testator, who creates, or contributes property to, a trust." *See* § 456.1–103 RSMo. As such, the MUTC is limited by its unambiguous terms to charitable trusts, and this court lacks the authority to apply common law precedent to construe the legislation in a manner that is inconsistent with the express language of the MUTC.

■ Moreover, just this year, Missouri adopted the Uniform Prudent Management of Institutional Funds Act ("UPMIFA"),[5] which expressly applies to both charitable trusts and nonprofit corporations. This law grants charitable organizations more discretion than they may have had under the common law to make prudent investment decisions regarding charitable funds and endowments. While the UPMIFA stresses that charitable fund managers give primary consideration to the donor's intent as expressed in the gift instrument, it does not expressly grant the donor standing to enforce this intent as the MUTC does in the case of charitable trusts. On the contrary, the prefatory note explicitly acknowledges that "the [A]ttorney [G]eneral *continues* to be the protector both of the donor's intent and of the public's interest in charitable funds." National Conference of Commissioners on Uniform State Laws, *PREFERATORY NOTE, UNIFORM PRUDENT MANAGEMENT OF INSTITUTIONAL FUNDS ACT,* at 4 (2006) (emphasis added). The UPMIFA is retroactive and does, therefore, apply to the Hardts' gifts. Thus, the two statutory schemes are inconsistent with respect to the enforcement of donor intent. A comment to the UPMIFA specifically acknowledges this possibility, stating, "[t]rust precedents have routinely been found to be helpful but not binding

---

4. The Hardts also cite *Obermeyer v. Bank of America, N.A.*, 140 S.W.3d 18 (Mo. banc 2004). *Obermeyer* states only that the cy pres doctrine applies to both gifts made to charitable trusts and to charitable corporations. *Id.* at 23–24. It does not support their contention that the MUTC would apply to a gift made to a charitable corporation.

5. §§ 172.290, 362.333, 369.162, 402.130, 402.132, 402.134, 402.136, 402.138, 402.140, 402.142, 402.144, 402.146, 402.148, 456.4–418, 456.5–505, 469.411, 472.335, 473.333, 475.130, & 475.190 RSMo. Enacted as H.B. 239 (2009). 2009 Mo. Laws 442.

authority in corporate cases."[6] In fact, the drafters of the UPMIFA reportedly considered an amendment granting standing to donors, and yet the amendment is absent from the final version adopted by the drafting committee. *See* Marion R. Freemont–Smith, *The Search for Greater Accountability of Nonprofit Organizations: Recent Legal Developments and Proposals for Change,* 76 Fordham L.Rev. 609, 621–22 (2007). For these reasons we find no statutory authority granting standing to the Hardts to enforce the restrictions of their gift.

■ The Hardts' second argument is that even if there is no statutory authority giving them standing to sue, Missouri should follow New York, which recently expanded the common law to allow donors to sue to enforce the terms of charitable gifts. In *Smithers v. St. Luke's–Roosevelt Hospital Center,* 281 A.D.2d 127, 723 N.Y.S.2d 426, 427 (N.Y.App.Div.2001), a man made a charitable gift to a hospital over the span of many years. His gift was subject to many restrictions on how the money could be spent, and the hospital expressly agreed to his restrictions. *Id.* at 428. The donor kept a close watch on the hospital's actions, withholding future installments of the gift until he was satisfied that the hospital was complying with his wishes. *Id.* at 427–28.

Years after the gift was complete, the donor passed away. His widow became concerned that the hospital was not using the charitable gift pursuant to the restrictions. She notified the Attorney General, who became involved with the enforcement of the restrictions. *Id.* at 429. Not satisfied with the vigilance of the Attorney General, the widow sued to enforce the restrictions. *Id.* at 430–31. The court noted that New York statutes rested standing to enforce restrictions with the Attorney General. This was true for both charitable trusts and absolute gifts. *Id.* However, the court found that the common law granted the donor standing as well, stating, "[t]he donor of a charitable gift is in a better position than the Attorney General to be vigilant and, if he or she is so inclined, to enforce his or her own intent." *Id.* at 434. There was a vigorous dissent, which argued that the majority impermissibly expanded the common law. *Id.* at 440.

Arguing that "public policy" favors granting donors standing to enforce restrictions on charitable gifts, the Hardts urge this court to follow New York's example.[7] They claim that the donor's interest is distinct from that of the Attorney General and hint that the Attorney General might not be vigilant or might even have a conflict of interest in enforcing the restrictions of the gift. This argument is not persuasive. In this case, unlike in *Smithers,* there is no indication in the record that the Attorney General was even notified of Vitae's failure to comply with the conditions. The Hardts apparently did not attempt to involve the Attorney General in the matter, taking it directly to court based upon their own interests. While it

---

6. *Uniform Prudent Management of Institutional Funds Act,* cmt. at 9 (2006).

7. The Hardts contend that California has similarly expanded the common law. However, the case they cite, *L.B. Research & Education Foundation v. UCLA Foundation,* 130 Cal. App.4th 171, 29 Cal.Rptr.3d 710 (2005), is not applicable. In that case, the court found a gift subject to a condition subsequent. *Id.* at 715–16. In the alternative, the court found that if the gift had been part of a charitable trust, the settlor would have had standing to enforce the restriction. *Id.* at 716. As is described above, neither of these alternatives applies here where the gift was not subject to a condition subsequent and there was no trust.

is conceivable that there may be times when the Attorney General does not sufficiently represent a donor's interest, it has not been shown to be the case here, and we find no reason to expand the common law to give standing to the Hardts. Indeed, in light of the legislature's passage of the UPMIFA, it would not be appropriate for us to do so.

■ Finally, the Hardts claim that the trial court erred in dismissing their action because the cy pres doctrine could be used to transfer their gift to another charity that will act consistent with the conditions they placed on the gift. The trial court's order stated that "Missouri law is clear that the cy pres doctrine applies only to trusts." This is a misstatement of Missouri law. *Obermeyer* plainly states, "[w]hile acknowledging the historical limitation of the cy pres doctrine to trusts, the doctrine is appropriate in certain cases involving gifts to charitable corporations." 140 S.W.3d at 23. The *Obermeyer* court then goes on to apply the doctrine to facilitate the completion of a charitable gift. *Id.* at 24–27.

■ Despite the trial court's misreading of *Obermeyer,* we do not find the doctrine of cy pres applicable to this case. Cy pres "is based on the concern of equity to protect and preserve charitable bequests." *Id.* at 22. Cy pres means "as near as possible" to the intent of the donor and is used to prevent, if possible, charitable gifts from failing. *Id.* at 23. The *Obermeyer* case is typical of those to which cy pres applies. In that case, a donor left a portion of his estate to his nieces and nephews for the duration of their lives, with the residue to go to a particular fund at the dental school of Washington University. *Id.* at 20. By the time the nieces and nephews were all deceased, neither the fund nor the dental school was in existence. *Id.* The court

found, looking to both the gift instrument and extrinsic evidence, that the donor had the general donative intent to give the money to Washington University to be used for the support of dental education and so allowed the gift to be completed to the University. *Id.*

This case is nothing like *Obermeyer* or any other case the Hardts cite using or considering the cy pres doctrine. Here, the gift was completed. The donee did not cease to exist. There was not a substantial separation of time between the granting of the gift and its completion. The Hardts simply feel that Vitae is not using the gift pursuant to the restrictions imposed when the gift was given. Accordingly, cy pres is not applicable. Furthermore, if cy pres were appropriate, the Hardts would still face their standing challenge.

Assuming the Hardts' gift to Vitae is subject to legitimate, enforceable restrictions and that Vitae is not using the gift appropriately pursuant to those restrictions, the Hardts' course of action should be to notify the Attorney General and to ask him to enforce the restrictions. Therefore, and for all of the above reasons, we affirm the judgment of the trial court.

THOMAS H. NEWTON, Chief Judge, and MARK D. PFEIFFER, Judge, concur.