Filed 10/26/23  Coleman v. Frontier Mission Fellowship CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ROBERT COLEMAN, | B325148 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 21STCV07636 |
| v. | |
| FRONTIER MISSION FELLOWSHIP, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge. Affirmed.

Robert Coleman, in pro. per., for Plaintiff and Appellant.

Lagerlof and Robert A. Bailey for Defendants and Respondents.

# INTRODUCTION

Plaintiff Robert Coleman appeals from the judgment of dismissal after the trial court sustained the demurrers of defendants William Carey International University, Inc. (WCIU) and Frontier Mission Fellowship, Inc. (FMF, and together, defendants) to his first amended complaint (FAC) and second amended complaint (SAC). Coleman's complaints alleged causes of action for breach of implied contract, quantum meruit, intentional infliction of emotional distress (IIED), and constructive fraud based on defendants' sale of part of defendants' Pasadena campus, which served as the mission center for their global development work, after Coleman donated significant amounts of time to defendants between 1976 and 1990 with the understanding that defendants would permanently maintain that campus. Coleman also challenges the court's denial of leave to further amend and the denial of his ex parte request to file a surreply. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1.    Factual Allegations

In the summer of 1975, Coleman completed his studies at the California Institute of Technology and attended the Institute for International Studies summer program, where he met Dr. Ralph Winter. Coleman and Winter engaged in discussions to form what became the World Mission Center-William Carey International University while Coleman began studies at the Fuller School of Intercultural Studies (Fuller). Winter negotiated a purchase of real property consisting of 12 buildings on 17.5 acres (Pasadena Campus) and 17.5 acres with 85 residential parcels and 120 homes in Pasadena, California. On November 5,

1976, Winter incorporated World Mission Center, Inc., which later became FMF.[1] WCIU was incorporated on February 25, 1977. The FMF-WCIU Boards were intended to be the same and were the same throughout the founding decade of the FMF-WCIU. WCIU would be a sister corporation controlled by the FMF board and founded by the FMF Training Division. Coleman left his studies at Fuller in fall of 1976 to help Winter develop the FMF-WCIU.

Winter also inspired and convinced Coleman to abandon his plans for a PhD at MIT and instead tackle global development issues by creating a permanent collaborative center where many agencies could innovate new solutions to problems. According to Winter, the entire Pasadena Campus, to be maintained in perpetuity, would become the permanent center, or "mission pentagon," for this work. Winter insisted that the campus be endowed from the beginning so that its future operations would not rely on undependable fundraising, securing FMF-WCIU's legacy into the future. Winter often emphasized that because the Pasadena Campus was "modest-sized," they (Winter, Coleman and the FMF-WCIU board) would need every square foot to perform FMF-WCIU's legacy.

During Coleman's studies at Fuller, during the incorporation of FMF-WCIU, and during selection of the boards of FMF-WCIU, and while he was chairman of the FMF-WCIU boards, Winter promised Coleman that if Coleman applied himself and his life's efforts to develop FMF-WCIU by assisting in soliciting donations for the down payment to purchase the

---

[1] We will refer to this entity by its current name of FMF for purposes of clarity.

property and make mortgage payments, the Pasadena Campus would be maintained and remain permanently in Pasadena as a central mission pentagon. Coleman alleged that Winter's promise to him was approved by FMF-WCIU's board, the promise is in FMF-WCIU's written archives, and that FMF-WCIU's board understood these writings to mean that the Pasadena Campus would be maintained and remain a permanent "mission pentagon." Coleman applied his time, energy, and youth to facilitate FMF-WCIU's purpose and to solicit donations. Coleman informed donors that the Pasadena Campus would be ongoing, endowed and continue until "all hidden people groups" were adequately reached. Both Winter and FMF-WCIU's board understood or reasonably should have understood Coleman's intent and condition.

In reliance on Winter's statements, Coleman devoted his time and energy to establishing FMF-WCIU in Pasadena, giving "his entire youth" from 1975 to 1991 to develop FMF-WCIU under a condition the Pasadena Campus would remain part of the legacy.

In May of 1986, Coleman proposed a "Last Thousand" fundraising campaign to the FMF-WCIU board to pay the remainder of the mortgage payment for the Pasadena Campus. The idea was to obtain $1,000 donations from approximately 8,000 donors and hold those donations in trust until all pledges were made, allowing the donors to "step over the line" together to save the Pasadena Campus.[2] Coleman insisted that FMF-WCIU

---

[2] The FAC alleges that the remaining mortgage payment was $8.5 million and 8,500 donors were needed, while the SAC alleges that the

needed to make the same promise and commitment to these donors that Winter and the FMF-WCIU board made to him regarding the permanency of the Pasadena Campus.

In 1988, Coleman left or was terminated from his position as VP of Development after the "Last Thousand" fundraising program, which the board of FMF-WCIU approved over Winter's dissent, succeeded.[3] From September 1988 to December 1990, Coleman remained a board member and provided time in consultation with the FMF-WCIU boards but was not provided any stipend for this time.

Winter died in 2009. In April 2017, Coleman discovered FMF-WCIU was in negotiations to sell the Pasadena Campus. In September 2017, Coleman began discussions with the FMF-WCIU board to cease and desist from selling as it would destroy FMF-WCIU's purpose and legacy. He also informed the board that, if the sale proceeded, it would be required to return prior donations if those donations were being used in a manner other than for which the donations were solicited, including Coleman's donation of his time. The board took the position that FMF-WCIU had no record that the Pasadena Campus would remain permanently in Pasadena and that, given a change in circumstances, the Pasadena Campus was no longer needed to fulfill the FMF-WCIU's purpose and intent. In December 2017,

---

remaining mortgage payment was $8 million and that 8,000 donors were needed.

[3] The FAC alleges that Winter terminated Coleman, whereas the SAC alleges that Coleman willingly stepped away from his position, "not wishing to distress a man Coleman had come to love as a surrogate father."

Coleman sent a letter to defendants stating that, if the Pasadena Campus was sold, they were required to return the donations back to the donors, or to a charity of the donor's choice. Defendants sent an email stating that they did not intend to substantively respond and that his letter contained many inaccuracies. Specifically, defendants' email stated: "We do not intend to respond substantively to your communication at this time, though we will do so at the appropriate time and place. It is important however to be clear that we, along with our counsel, find the positions articulated in your letter to be inaccurate and lacking factual and legal support. [¶] The WCIU and FV Boards will continue pursuing our vision and mission and the important work at hand."[4]

In June 2018, Coleman learned FMF-WCIU was in the process of finalizing an agreement for the sale and purchase of the Pasadena Campus and 16 residential parcels adjacent thereto. Coleman continued to attempt to persuade the board to reconsider, and in February 2019 two board members were convinced not to sell. FMF-WCIU sold the campus buildings plus 16 residential parcels in March 2019 for approximately $44 million, thereby failing to maintain the Pasadena Campus in perpetuity. FMF-WCIU's board did not reimburse Coleman for the reasonable value of his time donated after the sale of the property.

---

[4] In analyzing a complaint, we may consider matters "matters shown in exhibits attached to the complaint and incorporated by reference." (*Performance Plastering v. Richmond American Homes of California, Inc.* (2007) 153 Cal.App.4th 659, 665.) The December 2017 letter and defendants' email in response are incorporated by reference in the complaints and form part of the record.

Throughout the FAC and SAC, Coleman alleged that the services he performed for defendants were a "donation" or "conditional donation."

## 2.     Procedural Background

Coleman filed his initial complaint on February 25, 2021, and served it on defendants on May 20, 2021. Following a pre-demurrer meet and confer pursuant to Code of Civil Procedure section 430.41, defendants indicated an intent to file a demurrer and Coleman indicated a desire to file a FAC. Coleman provided the proposed FAC to defendants for meet and confer purposes and the court entered the parties' stipulation to extend the time for defendants to respond to the original complaint. On several occasions, counsel for defendants met and conferred with Coleman and an attorney that Coleman stated he intended to retain and identified defects in the original complaint and proposed FAC before defendants filed their demurrer to the FAC.

The FAC asserted four causes of action against defendants: (1) constructive fraud; (2) IIED; (3) breach of an implied contract; and (4) quantum meruit. With respect to constructive fraud, Coleman alleged that "a confidential relationship existed between them when they founded FMF-WCIU based on the trust and fidelity Plaintiff had in Defendants' representations"; that Coleman justifiably relied on that representation based on that trust and fidelity; by 1990, Coleman fully performed his services; and defendants had a duty to disclose that they would not maintain the entire Pasadena Campus in perpetuity but did not do so.

In support of his IIED cause of action, Coleman alleged that he "was induced to provide 15 ½ years of fully performed services to establish FMF-WCIU and the Pasadena [C]ampus

7

based on the fidelity and trust in the righteousness of Defendants whose conduct assured him he would receive a more meaningful life with the legacy, the Pasadena [C]ampus"; that "[t]he conduct of the Defendants selling the Pasadena [C]ampus in March 2019, and not maintaining the Pasadena [C]ampus in perpetuity eviscerates the legacy and the promise of a more meaningful life in a manner that is calculated to outrage"; that defendants' sale of the Pasadena Campus "concealed the original intent of establishing the Pasadena [C]ampus" and that "[t]he concealment, the ruse, was to create a fund of money and property for Defendants"; that this concealment "breached Plaintiff's trust in the righteousness of Defendants who promised to make his life more meaningful with a legacy"; and that "Defendants' actions and conduct in the aggregate, the failure and refusal to maintain the Pasadena [C]ampus in perpetuity, the sale of the campus Plaintiff gave his youth to create, concealing their assurances and promises, and their conduct that refused to refund Plaintiff any amount to rationalize their concealment, are extreme and outrageous conduct." (Italics omitted.)

Coleman alleged that the breach of implied in fact contract was established by the following facts: "Defendants solicited Plaintiff's services since 1976, to co-found FMF-WCIU and solicit donations"; "Plaintiff acted under the promise from Defendants that if he did perform such services, they would maintain the Pasadena [C]ampus in perpetuity and it would physically remain in Pasadena in perpetuity as a mission pentagon and as a legacy" (italics omitted); Coleman "performed labor and service for Defendants' benefit in which it was expressly and impliedly agreed and understood that Plaintiff would receive as

consideration for his performed services, the legacy of having the Pasadena [C]ampus remain in in perpetuity" (italics omitted); Coleman fully performed his services and defendants voluntarily accepted those benefits; and, in March of 2019, defendants sold 11 of the buildings on the Pasadena Campus and therefore materially breached and repudiated the contract.

With respect to the quantum meruit cause of action, Coleman alleged that, in exchange for his performance of services, "Defendants made an explicit and implicit promise that Plaintiff would receive for his services, the legacy of the Pasadena [C]ampus Defendants would maintain in perpetuity. The services Plaintiff performed were rendered with an understanding and expectation of Plaintiff and Defendants that Plaintiff's services were not gratuitous." By selling a portion of the Pasadena Campus, defendants "den[ied] to Plaintiff the very thing Defendants promised Plaintiff." Coleman alleged that defendants were not entitled to retain the material benefit they received "without restoring to Plaintiff, as a matter of justice, the Pasadena [C]ampus, his services, or the 15 ½ years of his youth."

On the day before the hearing on the demurrer, Coleman filed an ex parte application asking for leave to file a surreply based on defendants' citation to new authority in their reply brief. The court denied the ex parte application. After hearing argument from the parties, the court sustained the demurrer with leave to amend as to the constructive fraud and breach of implied-in-fact contract and without leave to amend as to the IIED and quantum meruit causes of action.

The court first sustained the constructive fraud and breach of implied-in-fact contract causes of action, with leave to amend, on the ground that the alleged agreement never to sell the

9

Pasadena Campus fell within the statute of frauds and is void as a matter of public policy and is unenforceable.

With respect to the constructive fraud cause of action, the court further concluded that the cause of action was time-barred because Coleman alleged that he learned in April 2017 that defendants intended to sell the Pasadena Campus. Since their decision to sell was the breach of the duties owed, Coleman had notice over three years before he filed the action. The court concluded that Coleman had failed to allege the existence of a confidential relationship between himself and defendants, as opposed to Winter, for purposes of alleging a confidential relationship as required to plead constructive fraud. The court also observed that Coleman had not alleged a misrepresentation or nondisclosure of a material fact that defendants were obligated to disclose, that defendants intended to deceive him, or that he changed his position because of the alleged nondisclosures.

With respect to the IIED cause of action, the court concluded that Coleman had failed to allege sufficient facts to suggest that defendants engaged in outrageous conduct with the intent, or reckless disregard of the probability, of causing Coleman emotional distress. Specifically, their exercise of their legal rights in pursuit of their own economic interest was not outrageous.

The court further concluded that Coleman had failed to plead a cause of action for breach of an implied contract due to the uncertainty of the allegations. The court found it was unclear from the complaint whether the alleged contract was an oral promise made by Winters and ratified by the board or implied in fact. The allegations of the FAC were also unclear as to the terms

10

of the agreement. Allegations that he agreed to devote his youth or life's efforts were vague and insufficient.

Finally, the court concluded that Coleman failed to allege sufficient facts to state a claim for quantum meruit because plaintiff alleged that his services were a conditional donation and, as such, he did not expect payment in return. Coleman alleged that he donated his time with the expectation that defendants would maintain the Pasadena Campus in perpetuity, and defendants' failure to do so does not transform the intent with which Coleman rendered his service.[5]

In April 2022, Coleman filed the SAC, which asserted amended causes of action for constructive fraud and breach of implied-in-fact contract. The SAC incorporated additional allegations concerning the relationship of trust and confidentiality between Coleman and the board. Specifically, Coleman alleged that he developed a deep and trusting confidential relationship with the board of directors of FMF-WCIU, each of which had far greater experience in the field of international development than he did, and that "he was in a vulnerable position in that he had no practical way to verify the information the board had gained with their combined decades of experience, and instead could only trust in the far superior global knowledge and corporate-founding knowledge of the board, as well as in the legal knowledge which the board and FMF-WCIU's attorneys had."

---

[5] In April 2022, Coleman filed a notice of appeal as to the trial court's order sustaining the demurrer to the FAC, which this court subsequently dismissed.

With respect to the implied in fact contract, the SAC further alleged that "[t]hose who worked to found FMF-WCIU were induced by a shared and clearly understood agreement, not by a specific written or oral contract. The shared agreement was to pay the mortgage on an endowed campus in Pasadena CA in exchange for the FMF-WCIU board maintaining the campus so that it became a legacy out from which great good would come for generations to help the world's overlooked people groups." Coleman further alleged that "[t]he clear implied contract then, the promise from FMF-WCIU, was that if a staff member, including Coleman, gave a great deal of sacrificial work to succeed in paying off the campus mortgage and the endowment properties, FMF-WCIU would put in place the legal, financial, and operational structures to maintain the campus as a permanent university, so that both staff, including Coleman, and board would be rewarded with the rare and valuable consideration of the permanent legacy of having founded and established an endowed, ongoing, continuing university doing great good in the world for generations to come."

In June 2022, defendants filed a demurrer to the SAC, which Coleman opposed. After defendants filed their reply, Coleman again filed an ex parte application to file a surreply, arguing that defendants had cited to additional authorities on reply. The court denied the ex parte application.

Following oral argument in August 2022, the court sustained defendants' demurrers.[6] The court found that, despite

---

[6] The court also held a hearing in June 2022 and issued a ruling before it was informed that the remittitur had not yet issued in connection with Coleman's initial appeal. The court therefore vacated its order.

Coleman's allegations that the statute of limitations was tolled until defendants refused to monetarily reimburse him for the services he provided after the March 2019 sale of portions of the Pasadena Campus, Coleman's "logic supporting these conclusory allegations is misplaced and belied by the underlying facts. As alleged, Plaintiff had knowledge, that at no point was contradicted, that Defendants were planning to sell the Pasadena Campus and informed Plaintiff they were ignoring his request for repayment of donations, at latest, in December 2017." The court again concluded that the breach of implied contract cause of action was barred by the statute of frauds and was a restraint on alienation and therefore void. The court found that Coleman failed to meet his burden of establishing that these defects could be cured by amendment and therefore sustained the demurrer without leave to amend. The court further concluded that Coleman had failed to allege sufficient facts to demonstrate that his constructive fraud cause of action was not barred by the three-year statute of limitations. This cause of action was based on defendants having promised not to sell the Pasadena Campus from 1976 to 1990, on which Coleman relied in performing work for defendants—promises that were false when made and were made with the intent to induce Coleman's performance. Thus, the fraud occurred between 1976 and 1990, and, to toll the statute of limitations such that the February 2021 complaint was not time-barred, Coleman must have discovered facts constituting the fraud no earlier than February 2018. However, Coleman had notice that defendants intended to sell the Pasadena Campus, and thus of the falsity of their prior statements, as of April 2017, and at the latest December 2017. The court further concluded that Coleman had not adequately pleaded that any tolling

13

doctrine applied and had not met his burden of establishing that the defects could be cured by amendment.

The court entered judgment in September 2022. Coleman timely appealed.

## DISCUSSION

Coleman contends that the court erred in denying leave to file his surreply to the FAC and by relying on new authorities cited by defendants in issuing its ruling on defendants' demurrer. He also asserts that the court erred in concluding that he was attempting to enforce a restraint on alienation. Coleman argues that, even if the action does seek to enforce a restraint on alienation, the restraint was reasonable and equitable estoppel requires that it be enforced. Additionally, Coleman contends that he adequately pleaded an IIED cause of action by alleging that the sale of the Pasadena Campus and defendants' concealment destroyed the meaning in his life and his peace of mind. Coleman further argues that he pleaded a quantum meruit cause of action because he alleged that he fully performed his services and seeks a return of the "thing" he expected to receive, the permanent campus or its equivalent in money. Coleman contends that the court erred in concluding that his constructive fraud cause of action was time-barred because defendants committed continuing violations through 2019. He also argues that he adequately pleaded the elements of a breach of implied contract. Finally, Coleman contends that the court erred in refusing to grant him leave to amend his complaints.[7]

---

[7] Although Coleman is self-represented, he is held to the same standard as an attorney. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975,

1.  **The Court did not abuse its discretion in denying Coleman's ex parte request to file a surreply.**

Coleman does not cite the relevant standard of review for the denial of an ex parte application or the denial of a request to file a surreply. The decision whether to consider a surreply is within the discretion of the trial court. (*Guimei v. General Electric Co.* (2009) 172 Cal.App.4th 689, 703.) As defendants observe, Coleman does not cite any authority supporting that a party has a right to file additional briefing, such that the denial of such a request may be considered prejudicial.

To the extent Coleman argues that the court abused its discretion in considering new authorities cited in defendants' reply brief in support of its demurrers to the FAC, we perceive no abuse of discretion. Coleman appears to take the position that any new authority cited in a reply brief is improper. That is not the law. "We will not ordinarily consider issues raised for the first

---

984–985.) Self-representation is not a ground for lenient treatment and a person who represents himself "must follow correct rules of procedure." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247.) Defendants identify several deficiencies in the record (some of which Coleman has attempted to remedy with a reply appendix) and Coleman's failure to comply with various provisions of California Rules of Court, rule 8.204, including the failure to include a statement of facts containing citations to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C) & (a)(2)(C).) To the extent it is intended to be a statement of facts, the "Case Summary" portion of Coleman's opening brief provides only a cursory overview of the facts alleged in his complaints and contains only occasional citations to the record. Two of the citations are to the entire "General Allegations" portions of the FAC and SAC, each of which are over 20 pages. Nevertheless, we exercise our discretion to reach the merits of Coleman's contentions. (*Id.*, rule 8.204(e)(2)(C).)

15

time in a reply brief. [Citation.] An issue is new if it does more than elaborate on issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief . . . . [¶] Defendants may cite new authorities in support of arguments properly raised in the opening brief." (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275–276.) *Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, which Coleman cites, does not contradict this principle. Rather, *Jacobs* involved the introduction of new evidence submitted on reply in support of a motion for summary judgment. (*Id.* at p. 449.)

Defendants argued in their demurrer to the FAC that a restriction on alienation is void and cannot be enforced. They cited *Estate of Molino* (2008) 165 Cal.App.4th 913 and Civil Code section 880.020 on reply for the proposition that an agreement is void where it has the violation of public policy as its object. The trial court could have reasonably interpreted these citations as elaborating on the argument already made in the opening brief that a restraint on alienation is void and unenforceable. The court could have also reasonably concluded that these new authorities responded to issues raised in Coleman's opposition brief, including his contention that he was not trying to enforce a void restraint on alienation. Further, Coleman had the opportunity to address new authorities at oral argument and may well have done so. As the reporters' transcripts are not part of the record, we are unable to determine whether that was the case. We therefore conclude that Coleman has failed to demonstrate that the court abused its discretion by denying his application for leave to file a surreply.

## 2. The court did not err in sustaining defendants' demurrers to the FAC and SAC without leave to amend.

### 2.1. Standards of Review

We independently review a trial court's order sustaining a demurrer to determine whether the operative complaint alleges facts sufficient to state a cause of action. (*Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 725.) We assume the truth of all properly pled factual allegations and matters that are judicially noticeable. (*Ibid.*) "An order sustaining a demurrer without leave to amend may be affirmed on any ground stated in the demurrer, even if the trial court did not act on that ground." (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2019) 42 Cal.App.5th 918, 934.) " 'It is the validity of the court's action in sustaining the demurrer which is here reviewable, and not the court's opinion or statement of reasons for its action.' " (*Weinstock v. Eissler* (1964) 224 Cal.App.2d 212, 225.)

When a demurrer is sustained without leave to amend, we decide whether there is a reasonable possibility that the plaintiff can amend his or her complaint to cure the defect. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) If the defect can be cured, "the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Ibid.*) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid.*) "Contrary to long-standing rules generally precluding a party from changing the theory of the case on appeal [citations], a plaintiff may propose new facts or theories to show the complaint can be amended to state a cause of action, thereby showing the trial court 'abused its discretion' [citation] in not

17

granting leave to amend." (*Connerly v. State of California* (2014) 229 Cal.App.4th 457, 460.) "The plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citations.]" (*Ibid.*)

### 2.2. The court did not err in concluding that the alleged agreement to maintain the Pasadena Campus in perpetuity is void.

Coleman asserts that the FAC and SAC did not seek to enforce an agreement placing a permanent restriction on alienation. However, even if Coleman is not seeking to invalidate or enjoin the sale, the relief that Coleman seeks depends on the enforceability of the implied agreement permanently restraining alienation of the campus and defendants' violation of that agreement.

"A void contract is without legal effect. [Citation.] 'It binds no one and is a mere nullity.' [Citation.] 'Such a contract has no existence whatever. It has no legal entity for any purpose and neither action nor inaction of a party to it can validate it . . . .' [Citation.]" (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 929.) Civil Code section 711 states: "Conditions restraining alienation, when repugnant to the interest created, are void." "Although at one time this section was construed to prohibit all restraints on alienation regardless of degree or duration, it is now settled that only unreasonable restraints are invalid." (*Taormina Theosophical Community, Inc. v. Silver* (1983) 140 Cal.App.3d 964, 973 (*Taormina*).)

Coleman contends that the implied agreement to never sell the campus is enforceable because it was reasonable when made. Specifically, he contends that the restraint on alienation was "clearly and directly related to FMF-WCIU's stated written

18

purpose." However, the test for whether a restraint is reasonable is not simply whether it advanced some purpose. "In determining whether a restraint on alienation is unreasonable, the court must balance the justification for the restriction against the quantum of the restraint. The greater the restraint, the stronger the justification must be to support it." (*City of Oceanside v. McKenna* (1989) 215 Cal.App.3d 1420, 1427.) "The issue of reasonableness is not a factual one, but rather a legal one." (*Id.* at p. 1424.)

In *Taormina*, Taormina Theosophical Community, Inc. (TTC), a nonprofit California corporation, recorded certain covenants, conditions and restrictions (CCRs) concerning properties it purchased. (*Taormina, supra*, 140 Cal.App.3d at p. 968.)[8] It later ratified amendments to the CCRs that limited ownership and occupancy of tracts of TTC's land to persons (1) who had been members of the Theosophical Society in America for three years, or (2) in exceptional cases, who had been members for less than three years, but had been approved by its Board of Trustees, and (3) who were 50 years of age or over. (*Id.*

---

[8] We are free to rely on cases not cited by the parties without providing them an opportunity to file further briefing so long as we do not base our opinion on an *issue* that was not raised by the parties. Specifically, Government Code section 68081 provides: "Before . . . a court of appeal . . . renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an *issue* which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing." (Italics added.) It does not require a court to seek the comment of the parties on each case and authority it wishes to cite. As an example, because we cite *Taormina* to analyze an issue raised and briefed by the parties (i.e., whether a permanent restraint on alienation is reasonable), no further briefing from the parties is required.

at pp. 968–969.) On appeal from a judgment granting injunctive relief to Taormina based on the breach of the CCRs, this Division concluded that the covenant restraining ownership of the land was unenforceable as an illegal restraint on alienation. (*Id.* at pp. 967–968, 973–974.) Specifically, the court found that "[t]he quantum of restraint in this case is very great. Southern California is a highly desirable place to live and people from all over the country seek to buy property here. In contrast to a vast potential market, the number of Theosophists in the United States is exceptionally small." (*Id.* at p. 973.) "The purpose of the restriction is to insure that those who settle in Taormina are sincere in their commitment to Theosophy." (*Id.* at p. 974.) The court recognized that although "the gathering together of like minded people may be a laudable goal, such purpose is not sufficient to sustain the heavy burden on alienability." (*Ibid.*) It therefore concluded that the covenant was an unreasonable restraint of alienation and void under Civil Code section 711. (*Ibid.*)

In the 40 years since the *Taormina* opinion issued, the demand for property in Southern California has only grown. The restraint at issue here is also even greater than the "very great" restraint permitting the sale of property to only an "exceptionally small" number of people. (*Taormina*, *supra*, 140 Cal.App.3d at p. 974.) As defendants contend, there could be no greater restraint on property than a permanent restraint on its sale *and* use. The aspiration of "fulfill[ing] . . . the FMF-WCIU core purpose to become a university that would stabilize and galvanize the entire global international development . . . movement" may be a laudable one, but advancing the goals of a nonprofit organization is insufficient to sustain the heaviest

20

possible burden on alienation. Coleman identifies no cases in which a permanent restraint on alienation *and* purpose was held to be reasonable. Thus, we conclude that the restraint was unreasonable as a matter of law. (See *Wood v. Nellis-Ryus* (1929) 101 Cal.App. 447, 449 [restriction in agreement forbidding owner from transferring any portion of property having less than a 60-foot street frontage "render[ed] the agreement unreasonable and unenforceable as a perpetual restraint against alienation of property"].)

We agree with defendants that the agreement to permanently maintain the Pasadena Campus, whether an oral promise, written promise, or implied in fact contract, was void. Even if Coleman adequately alleged the requirements for equitable estoppel, equitable defenses are inapplicable to void contracts. (*Tufeld Corporation v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 27 ["[I]f a contract is void and not merely voidable, the equitable defenses of estoppel, laches, and waiver do not apply."].)

We therefore conclude that the trial court correctly sustained the demurrer as to the breach of implied contract cause of action and decline to reach the issue of whether that cause of action was otherwise adequately alleged. However, we are not persuaded that the fact that the contract is void necessarily bars the remaining causes of action. (See, e.g., *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 461 [even though subject contract was void as against public policy, " 'there arises an implied contract to pay for services rendered thereunder, and the remedy of action sounding in *quantum meruit* is available to recover the reasonable value thereof' "].) We therefore assume that the fact that the contract is void and unenforceable does not prevent

Coleman from pleading the remaining causes of action, which we address separately.[9]

### 2.3. The court did not err in concluding that Coleman failed to adequately allege a cause of action for quantum meruit.

" 'Quantum meruit refers to the well-established principle that "the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered." . . . To recover in quantum meruit, a party need not prove the existence of a contract . . . , but it must show the circumstances were such that "the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made" . . . .' [Citation.] ' "The measure of recovery in quantum meruit is the reasonable value of

---

[9] Defendants also contend that Coleman's claims are barred by the statute of frauds. "[W]here assertion of the statute of frauds would cause unconscionable injury, part performance allows specific enforcement of a contract that lacks the requisite writing. [Citation.] . . . [T]o constitute part performance, the relevant acts either must 'unequivocally refer[ ]' to the contract [citation], or 'clearly relate' to its terms. [Citations.] Such conduct satisfies the evidentiary function of the statute of frauds by confirming that a bargain was in fact reached." (*In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1108.) Questions of partial performance and whether a party is equitably estopped from relying on the statute of frauds are typically questions of fact. (See *Pearsall v. Henry* (1907) 153 Cal. 314, 327 ["The question whether there has been a part performance of the oral agreement is necessarily one of fact . . . ."]; *Mehl v. People ex rel. Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 715–716 ["Estoppel is a question of fact . . . ."].) Because we conclude that Coleman did not adequately plead the remaining causes of action on other grounds, we need not reach this issue.

the services rendered, provided they were of direct benefit to the defendant." ' [Citation.] '[A] plaintiff must establish *both* that he or she was acting pursuant to either an *express or implied request* for such services from the defendant *and* that the services rendered *were intended to and did benefit* the defendant.' [Citation.]" (*Advanced Choices, Inc. v. State Dept. of Health Services* (2010) 182 Cal.App.4th 1661, 1673.)

We agree with the trial court that the allegations of the FAC do not support a claim for quantum meruit as a matter of law. The FAC refers to Coleman's work for defendants as a "conditional donation" and alleges that the condition for the services he rendered was "that the Pasadena [C]ampus would remain as a permanent mission pentagon." Similarly, in his opening brief, Coleman argues that he "expected to receive for his conditionally donated but fully performed services the legacy of FMF-WCIU maintaining the Pasadena [C]ampus permanently. [Citation.] This is a form of payment Coleman expected to receive." (Italics omitted.) On reply, he similarly contends that he "expected compensation of a permanent Pasadena [C]ampus."

Although the FAC alleges that Coleman expected *something* in exchange for his donation of time and services, its allegations do not support that Coleman offered his services for the purpose of receiving compensation, or that defendants understood that he was providing his services with the expectation of compensation. Coleman does not argue, nor did he allege, that the parties had an understanding that he would be paid the market value of his labor, which he estimates at approximately $550,000. The FAC also did not allege that the cost of permanently maintaining the Pasadena Campus was of comparable value to the labor that Coleman provided, or that any

23

party understood it to be. Coleman's quantum meruit claim is thus an attempt to enforce the terms of a conditional donation, rather than an attempt to enforce a quasi-contract for services. We have not located, nor has Coleman cited, any case in which quantum meruit was applied to permit a plaintiff to recover the value of services that were conditionally donated to a nonprofit institution.

"As a general rule, where a fund collected for a charitable purpose is made up of contributions from many persons, no one of them is entitled to call the trustees to account for misapplication of the fund or breach of trust. A mere contributor, to have a foothold for questioning the disposition of the fund, must have some special interest in the trust or a reversionary interest in the fund different from that of fellow contributors. Additionally, the donation of funds or property to a charitable institution, not given in trust, does not give the donor standing to challenge the institution's governance or changes to its practices." (15 Am.Jur.2d Charities, § 135, fns. omitted; accord, *Hardt v. Vitae Foundation, Inc.* (Mo.Ct.App. W.D.2009) 302 S.W.3d 133, 137 [under common law, donors are "prevented from enforcing their gifts in court, because non-trustee donors retained no interest in the gift, 'except the sentimental one that every person who contributed' to the charity would be presumed to have"].) This is consistent with language in *L.B. Research & Educ. Foundation v. UCLA Foundation* (2005) 130 Cal.App.4th 171, 180–181, which states that " ' "the only person who can object to the disposition of the trust property is one having some definite interest in the property—he must be a trustee, or a *cestui, or have some reversionary interest* in the trust property." [Citations.]' [Citation.]" The allegations of the FAC do not establish that

24

Coleman has standing to question the disposition of his donation or seek a return of his donation. There are no allegations concerning how donations to defendants' charities were held. It is also unclear how Coleman's labor could be held in trust or how he could maintain a reversionary interest.

In any event, the pertinent question with respect to the quantum meruit cause of action is whether the FAC alleges that Coleman's " ' "services were rendered under some understanding or expectation of both parties that compensation therefor was to be made" ' " (*Advanced Choices, Inc. v. State Dept. of Health Services*, *supra*, 182 Cal.App.4th at p. 1673), not whether he potentially has standing to seek the return of his conditional donation under some other theory. The FAC does not so allege, nor could it without contradicting the many allegations establishing that Coleman intended his services to be a donation. We therefore conclude that the court properly sustained defendants' demurrer as to the quantum meruit cause of action.

### 2.4.   Intentional Infliction of Emotional Distress

"The elements of a cause of action for IIED are as follows: (1) defendant engaged in extreme and outrageous conduct (conduct so extreme as to exceed all bounds of decency in a civilized community) with the intent to cause, or with reckless disregard to the probability of causing, emotional distress; and (2) as a result, plaintiff suffered extreme or severe emotional distress. [Citation.] Additionally, ' "[i]t must be conduct *directed at the plaintiff*, or occur in the presence of the plaintiff of *whom the defendant is aware*." [Citation.]' " (*Berry v. Frazier* (2023) 90 Cal.App.5th 1258, 1273.) "The complaint must plead specific facts that establish severe emotional distress resulting from defendant's conduct." (*Michaelian v. State Comp. Ins. Fund*

(1996) 50 Cal.App.4th 1093, 1114.) "While the outrageousness of a defendant's conduct normally presents an issue of fact to be determined by the trier of fact [citation], the court may determine in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." (*Trerice v. Blue Cross of California* (1989) 209 Cal.App.3d 878, 883.)

"An assertion of legal rights in pursuit of one's own economic interests does not qualify as 'outrageous.' " (*Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1398.) A person is privileged to pursue his or her own legal or economic interests even if the person knows the actions will cause another person emotional distress; however, "the exercise of the privilege . . . must be done in a permissible way and with a good faith belief in the existence of the rights asserted. [Citation.] It is well established that one who, in exercising the privilege of asserting his own economic interests, acts in an outrageous manner may be held liable for intentional infliction of emotional distress." (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 395–396.)

The FAC alleges that "[t]he sale of the campus, refusal to maintain the Pasadena [C]ampus in perpetuity, and the refusal of a refund are extreme and outrageous conduct, acts that are so extreme as to exceed all bounds of decency that are usually tolerated in a civilized community." We agree with the trial court that it was not extreme or outrageous for defendants to pursue their legal interests by declining to honor an agreement restraining alienation that was void and contrary to public policy. Moreover, the allegations of the FAC do not establish that defendants disclosed their decision to enforce their legal rights in

26

an impermissible or outrageous manner. The December 2017 email from defendants, which was incorporated by reference in the FAC, simply states that defendants rejected Coleman's legal and factual contentions. This is not extreme or outrageous conduct as a matter of law.

In his opposition brief below, Coleman argued that he adequately pleaded defendants' IIED in the FAC based on "the campus sale that destroyed the meaning in [his] life." He also asserted that "Defendants' conduct concealing their intent to create a fund of money and property breached Plaintiff's trust and integrity in the righteousness of Defendants who promised to make his life more meaningful with a legacy, but Defendants destroyed the legacy and the meaning in Plaintiff's life." Coleman did not rely on any allegation that defendants failed to reimburse him for the services he rendered. To the extent this argument was not waived, we are not persuaded that the FAC adequately alleges that defendants' refusal to reimburse Coleman for the labor he conditionally donated to defendants constitutes extreme or outrageous conduct. As discussed above, the allegations of the FAC do not establish that Coleman had or could have had a reversionary interest in the donation of his time, such that he had standing to enforce the terms of his conditional donation. Defendants' refusal to accede to Coleman's request for reimbursement for his donation of his time decades prior was a permissible exercise of their legal rights. Again, the FAC does not allege any facts concerning the manner in which defendants denied his request for reimbursement, and there is therefore no basis to conclude that Coleman adequately alleged that they did so in an impermissible manner. Although the FAC alleges that the effect of defendants' refusal to reimburse him was feelings of

27

outrage and despair, the fact that defendants' conduct resulted in Coleman's emotional distress is not all the cause of action requires.

Defendants argue that Coleman's contention that his IIED claim was premised on defendants' alleged concealment was not pleaded or raised below. We do not entirely agree. The FAC refers to defendants' alleged concealment with respect to the IIED cause of action. However, the FAC does not allege that "FMF-WCIU's conduct was concealing (deception) from Coleman that they never intended to maintain the Pasadena Campus permanently and never intended to give donors such as Coleman a refund if he determined his conditional donation was being used other than as he directed" (italics omitted), as Coleman argues on appeal without citation to the record. Rather, the FAC alleged that defendants' sale of the Pasadena Campus "concealed the original intent of establishing the Pasadena [C]ampus." However, according to the allegations of the FAC, the intent of creating a permanent "mission pentagon" was known to Coleman before defendants even existed as entities, when he and Winter first discussed the purpose of the Pasadena Campus. The FAC further alleges that defendants "conceal[ed] their assurances of maintaining the Pasadena [C]ampus in perpetuity." Had defendants concealed these assurances and promises, it is not clear how Coleman could have relied on them to his detriment.

Even if we construe the FAC as alleging that defendants concealed their intention not to abide by the original intent behind establishing the Pasadena Campus, the claim overlaps with his constructive fraud cause of action. We conclude that the two claims must rise or fall together. A defendant that does not have a confidential relationship with a plaintiff does not act in an

28

extreme or outrageous manner by failing to disclose information to the plaintiff, nor can the nondisclosure of a fact that is not material constitute extreme or outrageous conduct as a matter of law. With respect to the constructive fraud cause of action, the court concluded that the FAC had failed to allege facts sufficient to suggest the existence of a relationship of trust and confidence between Coleman and defendants. The court also concluded that the FAC did not allege a misrepresentation or nondisclosure of a material fact that defendants were obligated to disclose because whether defendants would maintain the Pasadena Campus in perpetuity was an opinion as to the future between 1976 and 1990, not a statement of existing fact.

We are not persuaded that *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092 (*Molko*) supports Coleman's contention that he adequately alleged an IIED cause of action. In *Molko*, the plaintiffs "contend[ed] the Church's fraudulent and coercive conduct was outrageous, was carried out with reckless disregard of the probability of causing them emotional distress, and was the actual and proximate cause of their severe emotional suffering." (*Id.* at p. 1120.) The plaintiffs relied on "the same conduct that support[ed] their fraud actions—i.e., misrepresentation and concealment of the Church's identity for the purpose of inducing them to submit unknowingly to coercive persuasion." (*Ibid.*) Specifically, the plaintiffs alleged that, "by the time the Church disclosed its true identity, the Church's agents had rendered them incapable of deciding not to join the Church, by subjecting them, without their knowledge or consent, to an intense program of coercive persuasion or mind control." (*Id.* at pp. 1108–1109.) "[I]n other words, . . . the Church deceived them into a setting in which they could be 'brainwashed,' and that the Church could not

then 'cure' the deception by telling them the truth after their involuntary indoctrination was accomplished." (*Id.* at p. 1109.)

The defendant challenged the plaintiff's fraud claims on constitutional grounds, and our Supreme Court "conclude[d] that neither the federal nor state Constitution bars [the plaintiffs] from bringing traditional fraud actions against the Church for allegedly inducing them, by misrepresentation and concealment of its identity, into unknowingly entering an atmosphere in which they were then subjected to coercive persuasion." (*Molko*, *supra*, 46 Cal.3d at p. 1119.) "The Court of Appeal, having found the fraud theory constitutionally impermissible, naturally found the same theory could not constitutionally provide the basis for a different cause of action." (*Id.* at p. 1120.) Having concluded that the fraud claim was constitutionally permissible (*id.* at p. 1121), the Supreme Court proceeded to analyze the plaintiffs' IIED claim and concluded that, "[v]iewed in the light most favorable to plaintiffs, the Church's continued deceptions might well be seen as conduct breaching plaintiffs' trust in the integrity of those who were promising to make their lives more meaningful" and thus "might well constitute an abuse of 'a relation or position which gives [the Church] power to damage the plaintiff's interest.' [Citation.]" (*Id.* at pp. 1122–1123.)

To the extent it is premised on concealment or nondisclosure, Coleman's cause of action for IIED, like the IIED claim in *Molko,* relies on the same conduct as his fraud cause of action. However, in *Molko*, the only challenge to the plaintiffs' allegations of fraud was that they were not constitutionally permissible. In contrast, the court here sustained a demurrer to Coleman's constructive fraud cause of action on multiple grounds. *Molko* does not stand for the proposition that, where an IIED

cause of action based on misrepresentation or concealment depends on the same allegations as a fraud cause of action, the IIED cause of action will survive regardless of whether the plaintiff has adequately pleaded the elements of the underlying fraud.

We therefore conclude that the court did not err in sustaining the demurrer to the IIED cause of action. However, since the court granted leave to amend with respect to the constructive fraud cause of action, it arguably should have also done so with respect to the IIED cause of action to the extent it was premised on the allegations of defendants' concealment, given the overlap between the claims. As we discuss below, the SAC also failed to plead specific facts supporting a nondisclosure of material fact made by defendants with the intent to deceive. Thus, we conclude that any error by the court in sustaining the demurrer to the IIED cause of action without leave to amend was not prejudicial.

### 2.5. The court did not err in sustaining the demurrer to the constructive fraud cause of action.

The trial court sustained the demurrer to the constructive fraud cause of action in the SAC on the ground that it was time-barred. We agree with the court's conclusion. Although we need not proceed further to conclude that the court properly sustained the demurrer with respect to the constructive fraud cause of action, we also address the sufficiency of the substantive allegations because they overlap with the IIED cause of action, as discussed above.

31

### 2.5.1. The trial court did not err in concluding that Coleman's constructive fraud claim was time-barred.

"The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." (*Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 517, fn. 14.) "An action for relief on the grounds of fraud or mistake must be commenced within three years. However, such action is not deemed accrued 'until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.' [Citation.] The courts interpret discovery in this context to mean not when the plaintiff became aware of the specific wrong alleged, but when the plaintiff suspected or should have suspected that an injury was caused by wrongdoing. The statute of limitations begins to run when the plaintiff has information which would put a reasonable person on inquiry." (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373–1374.)

Assuming for the sake of argument that the SAC adequately pleaded a cause of action for constructive fraud (a conclusion we do not reach, as discussed below), we agree with the trial court that "the alleged fraud occurred from 1976 to 1990, and Plaintiff seeks damages for work he performed for Defendants during this time span." The SAC does not allege that defendants continued to conceal their intent with respect to the Pasadena Campus after that time or induced Coleman's reliance to provide further services.

However, the cause of action did not accrue until Coleman "suspected or should have suspected that an injury was caused by wrongdoing." (*Kline v. Turner*, *supra*, 87 Cal.App.4th at p. 1371.)

The allegations of the SAC and the documents incorporated by reference therein establish that, as of December 2017, Coleman was on notice that any further efforts to persuade defendants against disclaiming the alleged agreement to never sell the Pasadena Campus were in vain. Although defendants declined to substantively respond to each of the points Coleman raised in his December 2017 letter, they stated in their email response: "It is important however to be clear that we, along with our counsel, find the positions articulated in your letter to be inaccurate and lacking factual and legal support" and that "[t]he WCIU and FV Boards will continue pursuing our vision and mission and the important work at hand." Coleman had every reason to suspect at this time that his labor had not secured the maintenance of the Pasadena Campus in perpetuity and that he had therefore been injured. Thus, we agree with the trial court that the statute of limitations began to run at this time.[10]

We do not agree that the " 'continuing violation' " doctrine extends the statute of limitations in this case. "[T]he term 'continuing violation doctrine' refers loosely to 'a number of different approaches, in different contexts and using a variety of

---

[10] Contrary to Coleman's assertion, *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383 is entirely consistent with this proposition. In *Norgart*, our Supreme Court stated that "the plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation] . . . ." (*Id.* at p. 397.) Coleman had strong reason to believe that something wrong had been done to him— that is, that his labor between 1976 and 1990 was based on a false promise that defendants now refused to acknowledge and clearly indicated that they did not intend to keep.

formulations, to extending the statute of limitations in employment discrimination cases.' " (*Carroll v. City and County of San Francisco* (2019) 41 Cal.App.5th 805, 820, quoting *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 813; accord, *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 368 ["the continuing violation doctrine is ' "arguably the most muddled area in all of employment discrimination law" ' "].) "The continuing violation doctrine serves a number of equitable purposes. Some injuries are the product of a series of small harms, any one of which may not be actionable on its own. . . . Allegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1197–1198 (*Aryeh*).) Our Supreme Court has applied this doctrine "where 'some or all of the component acts might not be individually actionable' and the plaintiff 'may not yet recognize' the acts 'as part of a pattern.' " (*Id.* at p. 1198, quoting *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1058.)

Although Coleman repeatedly uses the term "continuing violation" in his briefing, the cases on which he relies primarily concern the "continuous accrual" theory. " '[C]ontinuous accrual applies whenever there is a continuing or recurring obligation: "When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period." [Citation.]' " (*Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 395.) "Because each new breach of such an

34

obligation provides all the elements of a claim—wrongdoing, harm, and causation [citation]—each may be treated as an independently actionable wrong with its own time limit for recovery." (*Aryeh*, *supra*, 55 Cal.4th at p. 1199.) "[U]nlike the continuing violation doctrine, which renders an entire course of conduct actionable, the theory of continuous accrual supports recovery only for damages arising from those breaches falling within the limitations period." (*Ibid.*)

The relevant "violation" under the "continuing violation" or "continuous accrual" doctrine for a claim of constructive fraud must necessarily be further fraudulent conduct, not conduct that exposes prior fraudulent acts. As discussed, the final fraudulent acts were alleged to take place in 1990, when defendants last induced Coleman to provide services based on their alleged failure to disclose that they did not intend to maintain the Pasadena Campus as a permanent "mission pentagon." As our Supreme Court stated in *Aryeh*, the continuous accrual theory relies on the fact that all elements are present in each recurring breach. (*Aryeh*, *supra*, 55 Cal.4th at p. 1199.) Coleman cannot establish that all elements of constructive fraud were present in defendants' conduct between 2017 and 2019.

Similarly, even if the continuous violation theory were to apply in contexts outside of employment discrimination, it would not assist Coleman. When applying the continuing violation doctrine to a plaintiff's disability accommodation and disability harassment claims, our Supreme Court "held that when an employer unlawfully refuses reasonable accommodation of a disabled employee or engages in disability harassment, the statute of limitations begins to run either 'when the course of conduct is brought to an end, as by the employer's cessation of

35

such conduct or by the employee's resignation, *or when the employee is on notice that further efforts to end the unlawful conduct will be in vain.*' [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1056, italics added.) Defendants informed Coleman in December 2017 that they found his positions legally and factually baseless and that they intended to pursue their own vision. Thus, he was on notice as of December 2017 that further efforts to stop a sale would be in vain. The statute of limitations therefore began to run at this time and expired before Coleman filed his action in 2021.

Finally, the allegations of the SAC do not establish that equitable tolling applies. Coleman argues that "FMF-WCIU deceptively chose an 'appropriate time' to respond and inform him they would not give him a refund, that was after a time they thought they could manipulate an argument that the limitations period had expired." However, the SAC does not allege that defendants' December 2017 response lulled him into the belief that they would eventually respond. Rather, it alleges that "FMF/WCIU sent an e-mail on December 29, 2017, *effectively stating they would not respond*, and that the letter had contained many inaccuracies." (Italics added.) The email itself repudiates all factual and legal claims asserted by Coleman. Although Coleman contends that a third amended complaint would plead facts supporting equitable tolling or equitable estoppel, he does not identify any such facts, nor does he explain how he could do so without contradicting his prior allegations and documents incorporated by reference in his complaint.

36

Thus, the trial court correctly concluded that the constructive fraud claim was time-barred.[11]

### 2.5.2. Coleman fails to demonstrate that the court erred in sustaining the demurrer, even if the cause of action were not time-barred.

"Fraud must be pleaded with specificity, to provide the defendants with the fullest possible details of the charge so they are able to prepare a defense to this serious attack. To withstand a demurrer, the facts constituting every element of the fraud must be alleged with particularity, and the claim cannot be salvaged by references to the general policy favoring the liberal construction of pleadings." (*Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 782.) The requirement that fraud be pleaded with particularity extends to a claim of constructive fraud. (See *Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1250.) "The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." (*Younan v. Equifax Inc.*, *supra*, 111 Cal.App.3d at pp. 516–517, fn. 14.)

---

[11] In his reply brief, Coleman contends that Emergency Rule 9 applies to toll the statute of limitations. He did not raise this argument before the trial court or in his opening brief and has therefore forfeited it. (See *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 ["It is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal"]; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 ["Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge."].)

In his opening brief, Coleman does not address or rebut the other grounds defendants advanced in support of their demurrer to the constructive fraud cause of action, including: (1) that the fraud claims in the SAC remained vague and non-specific; (2) that the SAC failed to plead a confidential relationship between Coleman and defendants; (3) that the SAC did not plead a nondisclosure of material fact; (4) that the SAC did not plead that defendants had an intent to deceive; and (5) that Coleman did not and could not plead detrimental reliance in the SAC. "In order to prevail on appeal from an order sustaining a demurrer, the appellant must affirmatively demonstrate error. Specifically, the appellant must show that the facts pleaded are sufficient to establish every element of a cause of action and overcome all legal grounds on which the trial court sustained the demurrer." (*Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1052.) An appellant acting in propria persona has the same burden to affirmatively demonstrate reversible error as one who is represented by counsel; they are not entitled to any special treatment. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 523.) Coleman failed to establish that the facts pleaded in the SAC were sufficient to establish every element of his constructive fraud cause of action in his opening brief.

Even if we assume that he did not waive his contentions with respect to the substance of his constructive fraud cause of action by failing to raise them in his opening brief (*Paulus v. Bob Lynch Ford, Inc.*, *supra*, 139 Cal.App.4th at p. 685), Coleman's reply brief does not meet his burden of affirmatively demonstrating error. On reply, Coleman cites to the entire "General Allegations" portion of the SAC, comprising approximately 30 pages, in arguing that he pleaded constructive

fraud with particularity. The failure to cite the record with any particularity may be construed as a waiver. (See *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary."]; *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 891 [appellate court "will not develop the appellants' arguments for them"].)

In support of the contention that the SAC pleaded a confidential relationship between himself and the board after defendants were in existence, Coleman cites two pages of the SAC without identifying any specific allegations and cites a case without a pin cite, direct quotation, or parenthetical. Coleman does not identify the requirements for pleading a confidential or fiduciary relationship. Although he contends that, "[d]espite [his] education and degrees, he was still in a vulnerable position as he did not have the legal, administrative, and global knowledge the board had," it is not clear that the existence of any disparity between his knowledge and defendants' knowledge is sufficient to support a confidential relationship.

In further support of the contention that a duty of disclosure existed, Coleman string cites authorities without analysis. He does not compare the facts alleged in the SAC to the facts of the cited cases. Absent some explanation by Coleman, it is unclear how these cases bolster Coleman's claim that the allegations of the SAC establish that defendants owed him a duty for all or part of the period between 1976 and 1990. (See *Kloehn v. Prendiville* (1957) 154 Cal.App.2d 156, 161 [relationship where "parties had established a de facto family" and lived together in the same home]; *Barbara A. v. John G.* (1983) 145 Cal.App.3d

39

369, 382 [attorney-client relationship]; *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 561–562 [broker-client relationship].) Coleman asserts that, "[i]f necessary, a TAC will allege with further particularity the confidential relationship, and how Coleman was vulnerable to the board." However, no additional facts are identified, nor is it explained how any additional facts would address the requirements for pleading a confidential relationship.

Even if we assume that Coleman established the existence of a confidential relationship supporting a duty of disclosure, we conclude, as the trial court did with respect to the FAC, that the SAC does not adequately plead the existence of a nondisclosure of a material fact made with the intent to deceive.

Coleman asserts that "[a] [third amended complaint] will allege with particularity that FMF-WCIU's promise, and agreement was not an opinion or aspiration but were misrepresentations that commit the fraud." He does not argue with citation to the record that the allegations of the SAC establish that defendants' statements about maintaining the Pasadena Campus in perpetuity were not opinions about the future, as the court concluded with respect to the allegations of the FAC, but statements of existing fact as to which there was a duty of disclosure.

" 'A declaration of intention, although in the nature of a promise, made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, even though it is not carried out, does not constitute a fraud. [Citation.]' [Citation.] A good faith expression of intent or opinion by one partner to another does not come within the ambit of constructive fraud." (*Edmunds v. Valley Circle Estates* (1993) 16 Cal.App.4th 1290,

1301; accord, *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 430.) Thus, the SAC was required to allege that at least some of the statements defendants made concerning the maintenance of the Pasadena Campus in perpetuity were not made in good faith or were made with an intent to deceive.

The SAC alleges that "an FMF-WCIU board of directors was formed which fully embraced the vision of a permanent ID-focused center and university, first enumerated by Winter but now shared enthusiastically by the entire FMF-WCIU board of directors, a vision affirmed, acknowledged, agreed, approved, and acted upon by the entire initial FMF-WCIU board." These allegations establish that, when the defendant entities were founded, their board of directors shared Winter's and Coleman's dream of a permanent Pasadena Campus. The SAC does not allege when or how this intent or opinion changed. There are no specific allegations about which members of the board of directors made promises or representations to Coleman while concealing that they did not believe that the Pasadena Campus would be permanently maintained, or when such false promises or representations were made.

The allegations of the SAC indicate that it was not until *after* Coleman ceased to be involved with defendants as a staff or board member that the board no longer harbored the opinion or intent of maintaining the Pasadena Campus in perpetuity. The SAC alleges that: "Although Coleman always considered returning to the campus when Winter retired or passed on and was in conversation to do so after the 2015 re-affirmation of FMF-WCIU's permanence and value, Coleman had not realized that the new Board Winter had chosen when the old board resigned, perhaps because they had agreed to be subservient to

41

him as the absolute authority, but he was now gone, was unable to administer the campus effectively and determined to deceive Coleman and other conditional donors who had donated explicitly and specifically to purchase the Pasadena Properties as an ongoing center and university." This alleged "deceit" was the board of directors' engagement in discussions to sell the Pasadena Campus in April 2017. However, as discussed above, the only relevant concealment of defendants' intent was required to be pleaded with respect to the period between 1976 and 1990, when Coleman acted in reliance on defendants' representations.

One of the scant allegations we have located in the SAC concerning the beliefs or intent of members of defendants' board of directors is the allegation that a statement made by a FMF-WCIU board member in 2021 that "FMF-WCIU's intent was always about a mission and never about a place such as the Pasadena Campus out from which the mission would emanate . . . admits FMF-WCIU's deception and fraud, that FMF-WCIU intended to conceal that they never intended to permanently maintain the Pasadena Campus out from which the mission would emanate, and never intended to give any refund to any donor who determined that their donation was being used in a manner other than the donor directed." (Italics omitted.) Although we "accept[] as true the facts alleged in the complaint, together with facts that may be implied or inferred from those expressly alleged," we do not accept "the truth of contentions or conclusions of fact or law." (*Cadle Co. II v. Harvey* (2000) 83 Cal.App.4th 927, 930.) We are not required to accept the conclusions Coleman has drawn from the facts alleged. There are no allegations in the SAC that support that this member of the board of directors, speaking in 2021, had personal knowledge

42

regarding the intent or opinions of individuals who were members of the board of directors between 1976 and 1990, more than 30 years prior.

Accordingly, the SAC fails to plead with particularity the existence of any concealment by defendants of their true opinion or intent for the purpose of deceiving Coleman.

### 2.6. The court did not abuse its discretion in denying Coleman leave to further amend his complaint.

To satisfy the burden of proving there is a reasonable possibility of amendment, "a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.] The assertion of an abstract right to amend does not satisfy this burden. [Citation.] Plaintiff must clearly and specifically set forth the 'applicable substantive law' [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)

As a preliminary matter, Coleman asserts that the court committed prejudicial error in sustaining the first demurrers as to the IIED and quantum meruit claims without leave to amend, citing *McDonald v. Superior Court* (1986) 180 Cal.App.3d 297, 303. However, *McDonald* concerned an original complaint, not a FAC filed following meet and confers between the parties, during which defendants identified defects in the original pleading and in the proposed FAC before it was filed. (Accord, *Eghtesad v. State Farm General Ins. Co.* (2020) 51 Cal.App.5th 406, 411 ["for an original complaint, regardless [of] whether the plaintiff has

43

requested leave to amend, it has long been the rule that a trial court's denial of leave to amend constitutes an abuse of discretion unless the complaint 'shows on its face that it is incapable of amendment' "].) Coleman has failed to establish that he is relieved of his burden of demonstrating a reasonable possibility that he could amend those claims to state a cause of action. (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)

Coleman next contends that he could amend the complaint to "truthfully/factually allege in a TAC that his IIED cause is not based on verbal insults, is based on a legal protection against the intentional invasion of his peace of mind, and FMF-WCIU's outrageous conduct is their deception, concealment, and they do not have the right to defraud him and intentionally/recklessly destroy the meaning in his life when pursuing their economic interests, and refuse him a refund to recreate the meaning in his life they intentionally/recklessly destroyed." The court did not sustain the IIED cause of action because it believed it was based on verbal insults rather than the "invasion of [Coleman's] peace of mind." The court sustained the demurrer because even an intentional invasion of a plaintiff's peace of mind is not actionable if it was an exercise of defendants' legal and economic rights. Coleman does not explain how any new facts he might allege (none of which are identified) would address this shortcoming.

With respect to the quantum meruit cause of action, Coleman asserts that any defect could be "can be cured in a TAC by pleading more particularly CACI 370–371 (Coleman expected to be paid, FMF-WCIU paid him, took the payment away, and thus didn't pay him) and CACI 375 elements for restitution that were already partially pled in SAC¶105." Again, the broad categories of new facts Coleman proposes to plead do not address

the defect identified by the court, which is that there was no understanding between the parties that Coleman would be compensated for his services because they were a donation. "A plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false." (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877.) Although Coleman asserts in his reply brief (without citation to pertinent authority or the record) that he has a reversionary interest in his donation of services, Coleman does not propose an alternative cause of action that would permit him to seek reimbursement for his conditional donation or identify additional facts he could allege to address the challenges defendants raised with respect to his standing to pursue a claim of misuse of a donation by a charitable organization.

Coleman further argues that, "[i]f there were any defects in the SAC for the breach of implied in fact contract cause, leave to amend to file a TAC should have been granted [citation] as the defects can be cured by more specific allegations of FMF-WCIU's written and oral words and conduct that expressed their intent to permanently maintain the Pasadena [C]ampus and refund donations." However, the allegation of further facts reflecting an intent to maintain the Pasadena Campus permanently cannot overcome the fact that a permanent restraint on alienation and use was unreasonable as a matter of law. Thus, we conclude that there is no reasonable probability that such amendments would cure this defect.

Finally, as alluded to above, Coleman fails to identify any specific facts he would allege to salvage the constructive fraud

cause of action. Although Coleman proposes to amend the complaint to allege various conclusions that he has drawn from the December 2017 email that would support his tolling argument, we have concluded that the failure to allege the substantive requirements of constructive fraud provide an independent ground to affirm.

## DISPOSITION

The judgment is affirmed. WCIU and FMF shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, Acting P. J.

WE CONCUR:

EGERTON, J.

ADAMS, J.